**MOLINS PLC and John Coventry Smith, Jr., Plaintiffs,**

v.

**TEXTRON, INC., et al., Defendants.**

Civ. A. Nos. 86–446–JJF, 87–275–JJF and 87–163–JJF.

United States District Court, D. Delaware.

Nov. 24, 1992.

---

Arthur G. Connolly, Jr., of Connolly Bove Lodge & Hutz, Wilmington, DE, Charles E. Pfund, Philip G. Koenig, Lawrence M. Green, and A. Jason Mirabito, of Wolf Greenfield & Sacks, P.C., Boston, MA, for plaintiff Molins PLC.

Carl Schnee, of Prickett Jones Elliott Kristol & Schnee, Wilmington, DE, R. Stan Mortenson, Scott L. Nelson, and Lisa D. Burget, of Miller Cassidy Larroca & Lewin, William K. West, Jr., of Cushman Darby & Cushman, Washington, DC, for plaintiff John C. Smith.

Robert W. Whetzel, of Richards Layton & Finger, Wilmington, DE, Willem G. Schuurman, Eric B. Meyertons, of Arnold White & Durkee, Austin, Texas. Raymond J. Eifler, of Cross & Trecker Corp., Bloomfield Hills, MI, for defendants Textron, Kearney & Trecker and AVCO.

Robert Jacobs, of Jacobs & Crumplar, Wilmington, DE, Richard E. Dick, John S. Pacocha, and Howard E. Silverman, of Dick & Harris, Chicago, IL, for German defendants and Their U.S. Affiliates.

Thomas C. Grimm, of Morris Nichols Arsht & Tunnell, Wilmington, DE, Robert L. Harmon, Gary M. Ropski, and Rodney A. Daniel, of Willian Brinks Olds Hofer Gilson & Lione, Chicago, IL, for defendant Cincinnati Milacron, Inc.

FARNAN, District Judge.

## I. BACKGROUND

### A. Procedural History

This action was filed by Molins PLC ("Molins") and John Coventry Smith, Jr. ("Smith") alleging infringement of Plaintiffs' related patents, United States Patent Nos. 4,369,563 ('563 patent) and 4,621,410 ('410 patent), against three sets of defendants. The first set of defendants is comprised of Textron, Inc., Kearney & Trecker Corporation, and Avco Corporation. The second defendant is Cincinnati Milacron, Inc., and the last group of defendants are collectively known as the West German defendants.[1]

As a result of motions to intervene, consolidate, and amend pleadings, all Defendants are charged with infringing Molins' two patents in suit by making or using equipment embodying the patented invention within the United States. Defendants deny infringement and assert counterclaims alleging inval-

idity and unenforceability of the patents based on alleged inequitable conduct in connection with the prosecution of the '563 patent. The Court has jurisdiction over the parties and the subject matter of the claims pursuant to 28 U.S.C. § 1338(a). Further, Defendants' claim for declaratory judgment alleging the patents are invalid, unenforceable and not infringed, confers jurisdiction on the Court pursuant to 28 U.S.C. § 2201. Neither venue nor jurisdiction is contested by the parties.

The issues relating to inequitable conduct were separated from the other issues and tried separately to the Court. This Memorandum Opinion constitutes the Court's Findings of Fact and Conclusions of Law on the inequitable conduct issues.

### B. Background Facts [2]

#### 1. The Parties

Plaintiff Molins is a limited liability corporation of the United Kingdom with its princi-

---

1. The West German defendants include EMAG Maschinenfabrik GmbH, Friedrich Deckel Aktiengesellschaft, Huller Hille GmbH, MAHO Aktiengesellschaft, Oerlikon Boehringer GmbH, Scharmann GmbH & Co., and Werner Und Kolb Werkzeugmaschinen GmbH, and their United States affiliate companies UMA Corporation, Deckel Corporation, Hueller Hille Corporation, MAHO Machine Tool Corp., Scharmann Machine Tool Corp., and Fritz Werner Machine Tool Corporation.

2. The following facts rely on both stipulations by the parties and evidence adduced at trial. The stipulations are located in the pretrial order at pages (3)–1 through (3)–47. The following abbreviations will be used to reference evidence obtained at trial. A reference to testimony will be preceded by "Tr., p.". References to documentary evidence will be cited as follows: an exhibit offered by Molins will be referenced as "M–"; an exhibit offered by Smith will be referenced as "S–"; an exhibit offered by the first defendants will be referenced as "K–"; an exhibit offered by Cincinnati Milacron will be refer-

pal office at Milton Keynes, England. Between 1963 and 1973, Molins operated a Machine Tool Division for the design, manufacture, and sale of machine tools used in the high speed machining of light alloys. All applications for patents from Molins' Machine Tool Division were prepared by an in-house patent department which, during the mid–1960's, was headed by Mr. F.W. Hacking. Molins is now the sole owner of all rights, titles and interests in the '563 and '410 patents.[3]

Plaintiff Smith was a member of the patent law firm of Watson, Cole, Grindle and Watson which served as the primary counsel to Molins for United States patent applications from 1966 through the relevant time period in this case.[4] Stipulation 9.8. Smith has prosecuted many United States applications for foreign clients in his thirty years of experience as a patent attorney. Tr., pp. 346, 353. Beginning at least as early as March, 1967, Smith prosecuted all the patent applications leading to the issuance of the '563 and '410 patents. Stipulation 9.40.

In addition to the prosecution of the patent applications, Smith and Molins had at least two other noteworthy business arrangements. Stipulations 9.13, 9.17 and 9.23. In 1975, Smith was retained when Molins attempted to sell its patent portfolio to United States machine tool manufacturers. Stipulations 9.17 and 9.23. Also, in January of 1980, Molins assigned a one-half interest in its United States applications relating to the patents in suit ("Williamson applications") to Smith, in exchange for Smith's agreement to undertake further prosecution at his own expense. Stipulation 9.34.

Smith held a one-half interest in the patents in suit until July 1, 1988. On July 1, 1988, Plaintiff Smith assigned his interest in the patents in suit back to Molins. In exchange, Smith received a payment of 1.4 million dollars. Stipulations 10.127 and received a payment of 1.4 million dollars. Stipulations 10.127 and 10.128. As further consideration, Smith was to receive another one million dollars contingent upon Plaintiffs succeeding on a Motion for Summary Judgment attacking the validity or enforceability of the patents in suit. Stipulation 10.129. Smith is also to receive an additional 1.5 million dollars if Molins voluntarily dismisses the present lawsuit or fails to appeal an adverse verdict. Stipulation 10.130. Finally, Smith is entitled to one-half of all royalty income received by Molins from licenses on the patents in suit entered into prior to July 1, 1988. Stipulation 10.132.

Dennis Whitson ("Whitson") became employed at Molins in 1967, and was one of several chartered patent agents working in Molins' patent department. Stipulations 9.6 and 10.9. Whitson was the in-house patent agent responsible for the prosecution of patent applications covering the two machine tool systems that eventually led to the '563 ("System 24") and '410 ("Batch Process") patents. Stipulations 9.7, 10.9, and 10.11; Tr., pp. 31–33, 40. Whitson was viewed by his co-workers as a competent, very thorough and conscientious practitioner. Tr., p. 991. Whitson was aware of the duty of candor that requires United States patent applicants and their attorneys to disclose material information to the United States Patent and Trademark Office ("U.S. PTO"). Stipulations 10.13, 11.16 and 11.17; Tr., p. 65.[5]

---

enced as "C–"; and, an exhibit offered by the West German defendants will be referenced as "W–".

**3.** David T.N. Williamson ("Williamson"), the Research Director of Molins from 1961 to 1973, is the named inventor of both the patents in suit.

**4.** Smith left the law firm of Watson, Cole, Grindle and Watson on January 1, 1970 to join a new patent firm. He took several Molins matters with him to the new firm, including the Williamson applications that subsequently issued as the '563 and '410 patents. Smith is now practicing law in Arlington, Virginia.

**5.** Whitson currently suffers from various ailments. M–584. At trial, Whitson responded to those questions he was able to answer and readily admitted when specific facts or documents were difficult to recall. Tr. pp. 27–214. Whitson testified at trial that his memory is not affected by illness, but rather by the passage of time. Tr. p. 197. The Court finds that while Whitson's memory may be slightly impaired due to either illness or the passage of time, his testimony was credible.

When Whitson retired in 1981, Ivan Hirsh assumed the responsibilities and duties as manager of Molins patent department, and continues to serve in that capacity. Stipulations 9.35, 10.16 and 10.17. Hirsh joined the Molins Patent Department in 1968 and was aware of the duty of candor requiring United States patent applicants and their attorneys to disclose material information to the U.S. PTO. Stipulations 9.35 and 10.19. Prior to succeeding Whitson as manager in 1981, Hirsh had no involvement with the prosecution of the patents in suit. Tr., pp. 987–988. However, after becoming manager, Hirsh assumed responsibility for the patents in suit and the preparation and conduct of all litigation involving Molins' patent rights with regard to them. Tr., p. 270; G–127.

### 2. The Patents

The United States applications were just two of many counterpart applications filed by Molins throughout the world. The '563 apparatus patent corresponds to the System 24 applications, whereas the '410 method patent corresponds to the Batch Process applications.

The '563 patent discloses a system of controlled machine tools with the ability to transfer workpieces from a source to a machine tool for machining operations to be performed. The machine tools within any system are complementary so that different operations can be simultaneously performed on the workpieces. M–362; K–59A. The machine tools are numerically controlled to permit the automatic placement of a pallet with a workpiece in order for the machining operation to be performed.

Workpieces are transferred by an automatic conveyor system with the capacity to monitor their locations. A workpiece may bypass a machine tool if that machine tool has not been selected for operation at that time. The workpieces are able to go to any machine in any order. Both the transfer of the workpieces and the machining operations are controlled by a central computer control.

### 3. The Patent Application Process

The '563 patent issued on January 25, 1983. It matured from the following series of applications, listed briefly here and explained in greater detail below:

1. CASE I: Williamson Application No. 578, 318, filed on September 9, 1966 (Batch Process).
2. CASE II: Williamson Application No. 636,993, filed on May 8, 1967 (System 24).
3. CASE III: Williamson Application No. 695,817, filed December 4, 1967 as a continuation-in-part combining Cases I and II (Case I and Case II abandoned).
4. CASE IV: Williamson Application No. 85,289, filed October 29, 1970 as a continuation of Case III (Case III abandoned).

The '410 patent issued on November 11, 1986. It matured from substantially the same series of applications as the '563 patent. Shortly before the '563 patent issued, Molins filed Williamson Application No. 429,918 as a divisional application of Case IV, which subsequently issued as the '410 method patent.

#### a. Case I

In September, 1965, Molins filed Application 38937/65 in the United Kingdom. This application, based on an invention by Williamson, was directed to the Batch Process approach to machining. Stipulations 9.3 and 10.21. In September of 1966, corresponding patent applications were filed in many countries, including the United States. Stipulations 9.3, 10.23, and 10.29. The United States patent application covering the Batch Process was serial number 578,318 (hereinafter "Case I"), and relied on the United Kingdom application 38937/65 for its 1965 priority date. Stipulation 10.23. The Case I application contained claims 1 through 3 of the British Batch Process patent application. Stipulation 10.24. However, in March 1967, Smith filed an "Amendment before Action" wherein claims 1 and 3 were canceled and claim 4 was added.

#### b. Case II

In 1966 and 1967, Molins filed three successive applications covering the System 24 invention in the United Kingdom. The British applications were assigned numbers

21223/66, 12196/67 and 21109/67. In May of 1967, Molins filed United States patent application serial number 636,993 covering the System 24 invention (hereinafter, "Case II"), and relying on the three British applications for its priority date. Corresponding System 24 applications were filed in more than fifteen other countries.

### c. Case III

In December of 1967, Molins filed application serial number 695,817 (hereinafter, "Case III"), a combined continuation of Case I (the United States Batch Process application) and Case II (the United States System 24 application). Thereafter, Molins abandoned further prosecution on the individual Case I and Case II applications. Tr., p. 56; K–28. The merged Case III application included Batch Process claims 66 and 67 (claims 2 and 4 from the original Case I application) as well as sixty-five claims from the System 24 patent application. Stipulation 10.42.

On February 21, 1968, Smith and Whitson amended Case III to add claims 68 through 71. K–28, pp. 166–167. Case III then contained the following Batch Process Claims: claims 66 and 67 which were carried over from Case I, and new claims 68 and 69.[6] Tr. p. 1027; Tr. p. 1035; K–28, p. 166.

On June 6, 1969, the U.S. PTO issued a restriction requirement instructing Molins to make an election among four groups of claims contained in the Case III application. Under a fair reading of the restriction requirement, the U.S. PTO instructed Molins to make an election to prosecute either what it viewed as the method (Batch Process) claims or the apparatus (System 24) claims.

On July 7, 1969, Smith and Whitson filed a response to the restriction requirement. In their response, Whitson and Smith canceled claims 1, 2, and 3, and substituted claims 72, 73, and 74. In addition, Whitson and Smith argued that the restriction requirement was unwarranted but provisionally elected to proceed with the prosecution of claims designated as Group I, specifically claims 72–74, 4–54, and 68–71. K–28, pp. 171–173.

Following this election, the U.S. PTO examined the elected claims and on October 3, 1969 rejected each one. Tr. p. 1035; K–28, pp. 174–180. The rejected Batch-type claims (independent claims 68 and 69) were found to be anticipated by the Lemelson '014 patent. The independent System 24 claim (claim 72) was rejected as being anticipated by a combination of the Lemelson '014 and '510 patents. Tr., p. 1037 and K–28, p. 180.

After contacting Whitson several times for advice,[7] Smith filed a response to the October rejection on March 10, 1970. Tr., p. 1037; K–28, p. 190. In the March 10, 1970 response, Whitson and Smith substantially amended claims 68, 69 and 72. Tr., p. 1038–1039; K–28, p. 203. The amendments were designed to distinguish the claims over both of the Lemelson citations even though claims 68 and 69 had been formally rejected only on the basis of the Lemelson '014 patent. Tr., pp. 1039–1040; K–28, pp. 209–212.

On March 18, 1970, Smith amended the combined Case III application to change it from a continuation to a continuation-in-part (CIP).[8] Stipulations 10.27, 10.46, 10.48

---

6. There is some confusion as to whether claims 68 and 69 were Batch Process claims or System 24 claims. The U.S. PTO apparently viewed the claims as apparatus (System 24) claims. At trial, however, both Mr. Whitson and Mr. Hirsh testified that claims 68 and 69 were "batch-type" apparatus claims. For reasons outlined below, the Court finds that the distinction is not significant. In any event, claims 68 and 69 were subsequently amended into System 24 claims.

7. Prior to the March 10, 1970 response, Smith filed three petitions requesting additional time to respond, citing the need to have "certain information collected and forwarded in order that a fully responsive amendment could be prepared,"

and the fact that "the British associate attorney has not been able to forward to the attorney of record the necessary instructions and information on which to prepare a response to the outstanding Office action." K–28, pp. 181–187.

8. A continuation in part application is an application filed during the lifetime of an earlier application by the same applicant repeating all or a substantial portion of the earlier application and adding matter not disclosed in the earlier application. *Litton Systems, Inc. v. Whirlpool Corp.,* 728 F.2d 1423, 1437 (Fed.Cir.1984). A CIP has the legal effect of an application disclosing newly added matter. *Id.*

and 10.49; K–28, p. 216. Smith filed this amendment after the patent examiner pointed out to Smith that the Case III application should be amended to a CIP application because it was a combination of the Batch Process application (filed in September, 1966) and the System 24 application (filed in May, 1967). Stipulation 10.48.

The March 18, 1970 amendment also included a CIP declaration signed by Williamson. K–28, pp. 271a–e. The declaration indicated that as far as Williamson knew the contents of the application did not disclose anything that was ever previously known or patented or "described in any printed publication in any country." K–28, p. 217–c.

### d. Case IV

#### (1) Case IV Application

On October 29, 1970, Molins filed United States application serial number 85,289 (hereinafter, "Case IV") as a continuation of the Case III application previously filed in December of 1967. The Batch Process claims (claims 79 and 80) that appeared in the Case IV application were identical to original Batch Process claims 2 and 4 which appeared in the September 1966 Batch Process patent application, and Batch Process claims 66 and 67 from the Case III application. K–59A, pp. 124–148; Stipulation 10.48.

On December 29, 1971, the U.S. PTO issued an Office Action rejecting Batch claims 79 and 80. Tr., pp. 136–137; K–59B, pp 203–208. The claims were rejected because the examiner concluded that they were directed to an invention other than that disclosed in the Case III parent application.

Whitson and Smith met in April of 1972 to respond to the December 1971 Office Action. Tr., pp. 137, 163–167. In their response, filed April 27, 1972, Whitson and Smith amended the application adding new claims 176 through 185. It is clear from a statement prepared by Whitson and Smith that the new claims were included to distinguish

the invention over Lemelson Reissue patent RE 26,770. Whitson and Smith stated that "claims 176–185 have been added by the present amendment to further define applicant's invention, and it is submitted that these claims clearly distinguish over the single prior art reference of record." K–59B, p. 239. The single prior art reference referred to was Lemelson Reissue patent RE 26,770. K–59B, p. 205.[9]

In addition to adding claims 176 through 185, Molins copied claims from patent number 3,575,540 ("Fair patent") which, by assignment, was held by the Sundstrand Corporation. The Fair patent disclosed a computer controlled machining system and contained features common to the Case IV application. The purpose of copying the claims was to provoke an interference with the Fair patent and determine which party was entitled to priority for the common claims. Claims 176 through 185 were in place to dominate the Fair patent if the U.S. PTO refused to initiate interference proceedings or, alternatively, to allow for priority of those claims in an interference proceeding.

#### (2) Perry/Fair/Williamson Interference

On January 31, 1973, the U.S. PTO declared an interference proceeding. At issue in the interference were the Case IV application (Williamson patent application), the Fair patent, and the Perry patent application, a patent directed to a computer controlled machining system which had been assigned to Defendant Cincinnati Milacron. On April 4, 1977, the U.S. PTO awarded Molins priority on all principal counts, finding that Williamson was the first to invent the claims that were common among the various applications.

The continued prosecution of the Case IV application in the United States required an additional seven years before a patent was issued. During this time the patent office examiner and Smith exchanged several office actions and responses thereto.[10] Eventually,

---

9. The other Lemelson patents (the '014 and '501 patents) had previously been distinguished in the prosecution of Case III. K–28, pp. 209–212 and Tr. pp. 1039–1040.

10. On June 27, 1978, the patent examiner issued an Office Action rejecting all pending Molins claims on a variety of grounds including vagueness, indefiniteness, and obviousness over prior art references, which principally included a combination of Lemelson references similar to a pri-

on January 25, 1983, the Case IV application matured into the issuance of the '563 apparatus patent. The corresponding '410 method patent, was issued on November 11, 1986.

### e. Re-examination of '563

On October 3, 1984, Cross & Trecker, the parent of Kearney & Trecker, filed a request for re-examination of the '563 patent. Stipulation 4.1. The re-examination was a specific request to evaluate the '563 patent in light of six or seven IBM references. Tr., pp. 618–619. The outcome of the re-examination was the issuance of Re–Examination Certificate B1 4,369,563 on May 13, 1986. The Re-Examination Certificate deemed certain claims of the '563 patent valid over the newly cited prior art, found certain claims patentable when amended as described, deemed certain claims that were dependent on the amended claims to be patentable, and found certain new claims patentable.

### 4. Abandonment of Foreign Applications

As stated earlier, at about the time that Molins filed the Batch and System 24 applications in the United States, Molins also filed counterpart applications in some 20 other countries. But, in 1968, Whitson concluded that the Batch Process invention was fully anticipated by an article, Wagenseil, W., "America's First Tape–Controlled Production Line," Metalworking Production Magazine (June 13, 1958).[11] Stipulation 9.10. Thus, from early 1968 through August, 1969, Molins abandoned all pending foreign batch applications.

The following actions were taken by Whitson to cease prosecution of foreign Batch Process applications due to the Wagenseil reference:

| DATE ABANDONED | COUNTRY | REFERENCE |
| --- | --- | --- |
| April 11, 1968 | Austria | K–405 |
| 1968 | West Germany | Tr. p.306 |
| June 26, 1968 | Poland | TT 306/C–233 |
| October 21, 1968 | Russia | K–406/C–230/Stip. 10.35 |
| November 8, 1968 | Japan | K–407/C–231/Stip. 10.37 |
| January 29, 1969 | Canada | K–344/C–233/Stip. 10.38 |
| June 10, 1969 | United Kingdom | K–345/C–234/Stip. 10.39 |
| July 3, 1969 | Czechoslovakia | TT 96/C–235 |
| August 1969 | All Other Foreign | Stipulation 9.12 |

or combination overcome by Molins in Case III. Stipulation 9.29 and 10.81. In this Office Action the examiner also cited, as secondary references related to ancillary claims, the Kumagai patent 3,245,144 and Riedel patent 3,010,371. (Stipulation 9.30).

During 1978, 1979, and early 1980, the examiner and Smith exchanged several Office Actions and responses, in the course of which Smith submitted claim amendments directed at meeting the examiner's objections to the claims as then presented. Stipulation 9.31.

In April of 1980, the examiner notified Molins that he was prepared to allow some of the Molins claims then presented, except for claims that Molins had copied in 1973 from a Perry application. Stipulation 9.32. This refusal on the part of the examiner was upheld by the appeals Board on May 17, 1982. Stipulation 9.33.

11. Whitson became aware of the Wagenseil reference sometime between the fall of 1967 and April 1968 (Stipulation 9.9; K–4). On April 11,

1968 Whitson wrote to his supervisor, Mr. F.W. Hacking:

> [Wagenseil] makes clear that workpieces go only to selected machines. It appears also that a workpiece can be recirculated past the machines so that it can be taken to the selected machines in any order.
>
> This completely knocks out our case and I suggest that we abandon our application. In my opinion continuation of prosecution would be a waste of time and money.

Stipulation 10.36 and K–405. Further, Whitson wrote the following to the Canadian patent office:

> [I] do not think one could honestly suppress the fact that the German application had been abandoned, and I do not see that one can honestly prosecute Claims 1 and 4 with knowledge of the enclosed publication.

K–344.

Eventually, Molins also abandoned all foreign System 24 applications. Both the German and the Japanese System 24 applications were abandoned because of Wagenseil. In April and May of 1975, six West German and one East German company filed oppositions to the German System 24 application, two of whom cited Wagenseil as relevant prior art. Stipulations 9.14 and 10.64. Then, in 1976, Benziger, under the guidance of Whitson, wrote to Molins' German attorney, instructing the attorney not to file an opposition in order to allow the application to be abandoned. Stipulation 10.66.

The Japanese System 24 application was finally abandoned in 1976 at which time it stood rejected over a combination of citations. Stipulation 9.28. One citation was to the Lemelson '247 patent and the other citation was to a 1962 article from *Metalworking Automation* by George DeGroat which contained a copy of the Wagenseil diagram. Stipulation 9.28; K–141. At this time all foreign System 24 applications and issued patents were abandoned. Stipulation 9.27. The only remaining application was in the United States.[12] Stipulation 9.27.

## C. PRIOR ART

### 1. Wagenseil

According to Whitson, Wagenseil "disclosed the palletizing of workpieces and the adaptation of a group of complementary machine tools to accept and position such palletized workpieces automatically." Stipulation 9.10. Further, Whitson concluded that:

> Wagenseil makes clear that workpieces go only to selected machines, It appears also that a workpiece can be recirculated past the machines so that it can be taken to selected machines in any order.

Stipulation 10.36 and K–405.

At trial, Paul Haas, Defendant's expert in manufacturing systems described what the Wagenseil publication disclosed to an ordinary person skilled in the relevant art in 1966. Tr., pp. 726–728. Based on Mr. Haas'

testimony, the Court finds that the Wagenseil block diagram or flow chart discloses an automatic manufacturing system. The system is used to make multiple numbers of parts using a random part delivery system under the direction of a central control system. The central control system is represented by a digitape control disclosure in the drawing.

The diagram provided in Wagenseil shows loading stations that are identified as "1" through "N", 1 indicating the first of N number of loading stations required for any production run. The connotation N is used to indicate that the system can handle as many machines as required by the workpiece. A source of palletized workpieces is inherent in the 1 through N loading stations.

Leading away from the loading stations, or source, following the direction of the arrows, is a conveyor that enables the workpieces to travel through the system. At the first machine, there is a bifurcated arrow which indicates that the workpiece could either bypass the machine or enter into the machining loop of that particular machine. Thus, at each machine in the material handling system, the workpiece would have the ability to either bypass the machine loop or enter the machining loop as required. If a machine is bypassed because it is busy or another series of operations is required, the workpiece can be recirculated through the system.

The machine tools are complementary machine tools in that they perform different operations as required by the workpieces. Each machining tool loop may contain more than one machine tool.

### 2. Lemelson '014 and '501 Patents

As stated above, a combination of the Lemelson '014 and '501 patents was used to reject the '563 Case III application in 1969. Lemelson 3,119,501 discloses an automatic warehousing system where there exists "a storage and retrieval system which includes a programmed control apparatus for control-

---

**12.** Until the System 24 patent issued in 1983, Smith continued the prosecution of the application and exchanged responses and Office Actions with the assigned patent examiner. Stipulations 9.29—9.33, 10.81, 10.82, and 10.116.

ling an article carrier in delivering and retrieving a selected article." K–28, p. 204. Lemelson 3,313,014, on the other hand, discloses an automatic production system where "a plurality of production machines with a programmable conveyor delivers and retrieves workpieces to and from selected production machines." K–28, pp. 204–205. These patents individually represent two very different applications, one permitting storage and retrieval, the other permitting the transfer of a workpiece within a production line for work at a specified machine. The Court finds neither teaches the combination of the two, because there is no disclosure of a central control governing both of the systems. K–28, p. 206.

## II. DISCUSSION

Defendants argue that the '563 patent is unenforceable because Plaintiffs, through the actions of Whitson, Smith, and Hirsh, engaged in inequitable conduct before the U.S. PTO. Specifically, Defendants allege that (1) Whitson, Smith, and Hirsh each engaged in inequitable conduct in failing to disclose Wagenseil to the U.S. PTO during the prosecution of the '563 patent; (2) Whitson and Smith's failure to disclose Lemelson Patents Nos. '247, '014 and Reissue No. 26,770 constituted inequitable conduct; and (3) Whitson's submission of a false declaration to the U.S. PTO constituted inequitable conduct. Plaintiff does not deny having knowledge of the undisclosed Wagenseil reference and the Lemelson patents, but argues that the Wagenseil reference and the Lemelson patents were cumulative of the relevant prior art that was cited in the U.S. applications. Plaintiff further contends that Whitson, Smith, and Hirsh in any event, did not act with an intent to deceive the U.S. PTO.

After a discussion of the applicable legal standards, the Court will address each of Defendants' allegations of inequitable conduct, as well as Defendants' claim that Hirsh's destruction of records makes this an exceptional case.

**13.** Although Rule 56 was not adopted until 1977, the basic tenets of that rule were in effect in 1973–1974. *Manville Sales Corp. v. Paramount*

## A. Applicable Legal Standards

 Applicants for patents and their attorneys owe the U.S. PTO a duty of candor, good faith, and honesty. *FMC Corp. v. Manitowoc Co.*, 835 F.2d 1411, 1415 n. 8 (Fed.Cir.1987); *Hycor Corp. v. Schlueter Co.*, 740 F.2d 1529, 1538 (Fed.Cir.1984); *American Standard Inc. v. Pfizer Inc.*, 722 F.Supp. 86, 141 (D.Del.1989) (citing *Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.*, 324 U.S. 806, 818, 65 S.Ct. 993, 999, 89 L.Ed. 1381 (1945)). A breach of this duty constitutes inequitable conduct. Inequitable conduct may consist of an affirmative misrepresentation, a misleading statement, or an omission of material information. *Fox Industries, Inc. v. Structural Preservation Systems, Inc.*, 922 F.2d 801, 804 (Fed.Cir. 1990).

 Rule 56(a) of Title 37, Chapter 1 of the Code of Federal Regulations provides that applicants and their attorneys must "disclose to the [PTO] information they are aware of which is material to the examination of the application." [13] 37 C.F.R. 1.56(a) (1989). This duty has been held to be equally applicable to foreign practitioners who represent claims in the U.S. PTO through local firms. *Gemveto Jewelry Co. v. Lambert Bros., Inc.*, 542 F.Supp. 933, 943 (S.D.N.Y. 1982).

 One who asserts a defense of inequitable conduct based on a failure to disclose material prior art must show by clear and convincing evidence:

(a) materiality of the nondisclosed prior art (materiality);

(b) knowledge chargeable to the applicant of the prior art or information and its materiality (knowledge); and

(c) failure of the applicant to disclose the art or information resulting from an intent to mislead the U.S. PTO (intent to deceive).

*FMC Corp. v. Manitowoc Co.*, 835 F.2d 1411, 1415 (Fed.Cir.1987). Thus, for the Court to conclude that inequitable conduct occurred,

*Systems, Inc.*, 917 F.2d 544, 551–552 (Fed.Cir. 1990).

the Court must first find that certain thresholds of materiality and intent are present. *Under Sea Indus., Inc. v. Dacor Corp.*, 833 F.2d 1551, 1559 (Fed.Cir.1987); *J.P. Stevens & Co. v. Lex Tex, Ltd.*, 747 F.2d 1553, 1562 (Fed.Cir.1984) (citations omitted), *cert. denied*, 474 U.S. 822, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985).

■ Information is material if "there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent." 37 C.F.R. § 1.56(a); *Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 992 (Fed.Cir.1988). Under this standard, an applicant need not disclose all relevant prior art. *J.P. Stevens & Co.*, 747 F.2d at 1559. The applicant need not disclose prior art which is less material, or merely cumulative to that considered by the examiner. *Rolls–Royce Ltd. v. GTE Valeron Corp.*, 800 F.2d 1101, 1107 (Fed.Cir.1986).

■ Whether the requisite intent to deceive is present in a case must be determined in light of all the evidence. Because direct evidence of an intent to deceive rarely exists, the Court may rely on circumstantial evidence leading to an inference of intent to mislead as the basis for a finding of inequitable conduct. *Hewlett–Packard Co. v. Bausch & Lomb Inc.*, 882 F.2d 1556, 1562 (Fed.Cir. 1989).

■ A finding of gross negligence, however, does not of itself justify an inference of intent to deceive. *Kingsdown Medical Consultants, Ltd. v. Hollister, Inc.*, 863 F.2d 867, 876 (Fed.Cir.1988) (in banc). Instead, the Court must view the conduct in light of the totality of the circumstances, "including the nature and level of culpability of the conduct and the absence or presence of affirmative evidence of good faith." *Id.; see also Consolidated Aluminum Corp. v. Foseco Int'l Ltd.*, 910 F.2d 804, 809 (Fed.Cir.1990); *RCA Corp. v. Data General Corp.*, 887 F.2d 1056, 1065 (Fed.Cir.1989).

■ Once the thresholds of materiality and intent are established, the Court must balance them to determine whether the equities in the case warrant a conclusion that inequitable conduct occurred. *J.P. Stevens*

*& Co.*, 747 F.2d at 1559–60. In this regard, materiality and intent are inversely related; "the more material the omission, the less culpable the intent required, and vice versa." *Halliburton Co. v. Schlumberger Technology Corp.*, 925 F.2d 1435 (Fed.Cir.1991) (citing *N.V. Akzo v. E.I. Dupont de Nemours*, 810 F.2d 1148, 1153 (Fed.Cir.1987)).

**B. Whitson's, Smith's, and Hirsh's Failure to Disclose Wagenseil**

**1. Materiality of Wagenseil**

■ As the parties agree that the Wagenseil article was highly material to the Batch Process Claims, the Court finds it unnecessary to engage in a lengthy discussion of the evidence leading to its conclusion that Wagenseil was material. The batch process invention was a very broad concept of a method for batch machining that involved a group of complementary, individual numerically controlled machine tools capable of accepting standardized pallets loaded with workpieces. The machine tools would have the capability to automatically position to the pallets for machining the workpieces.

Wagenseil's article describes a machining system in which pallets loaded with workpieces are transported to numerically controlled machine tools capable of automatically positioning the workpiece. In addition, Wagenseil disclosed a capability for workpieces to recirculate into the system, and for workpieces to bypass certain machine tools within the system.

Thus, the Court concludes, and the parties concede, that the Wagenseil article discloses each of the significant elements of Williamson's Batch Process invention. The Wagenseil reference completely anticipated Molins' Batch Process claims, and was a prior art reference of the highest materiality with respect to any Batch Process claims in the various U.S. applications.

■ With regard to the System 24 claims, Plaintiff contends that Wagenseil was not a material prior art reference. The Court disagrees. Wagenseil was a highly material prior art reference in the System 24 claims as evidenced by Molins' disclosure of

the reference in the foreign System 24 counterpart applications, and Molins' attempt to claim patentability of the German System 24 invention by distinguishing it over Wagenseil.

The Court is persuaded that the most telling evidence in the case on the issue of materiality of Wagenseil in the prosecution of the System 24 claims is Whitson's response to a request from the German Patent Office for Whitson to disclose all prior art cited in other countries. The German request prompted Whitson to indicate that Wagenseil was the most relevant disclosure to the System 24 application of which he was aware. Benziger, Whitson's subordinate, made a similar statement in 1975. In a letter to Whitson's Japanese associate, Benziger stated that Wagenseil was the *closest prior art* of which Molins was aware out of *all* the art references appearing in *all* corresponding applications.

At least two foreign patent examiners agreed with Whitson and Benziger that Wagenseil was highly material to the System 24 applications. On June 12, 1974, a Dutch patent examiner issued an Office Action which suggested that he regarded Wagenseil as the closest prior art to the System 24 application. Likewise, a Japanese patent examiner rejected the System 24 application because of disclosures taught by a combination of Wagenseil with Lemelson patent '247.

Although a court must exercise caution in relying on foreign patent prosecution due to differences in disclosure requirements, claims practice, forms of applications and standards of patentability, actions in foreign prosecution may prove relevant to domestic prosecution of a patent. *J.P. Stevens & Co.,* 747 F.2d at 1566. With the *J.P. Stevens* admonition in mind, the Court concludes that in light of Whitson's own admissions as to the materiality of Wagenseil in several forums, a reasonable examiner in the U.S. PTO would have considered Wagenseil important in deciding the prosecution of the then pending United States System 24 claims.

Plaintiff contends that Wagenseil was not material because it was merely cumulative of prior art that was before the U.S. patent examiner. Plaintiff Molins argues that Wagenseil did not disclose features pertinent to the Case III application that were not disclosed by Lemelson patents '014 and '501—prior art references relied upon by the U.S. PTO to reject Molins' System 24 claims.[14] Lemelson '501 discloses an automatic storage and retrieval system. Lemelson '410 discloses an automatic transfer system.

■■■■■ A person need not disclose a reference if it would be merely cumulative of other references before the patent examiner. *Specialty Composites v. Cabot Corp.,* 845 F.2d 981, 992 (Fed.Cir.1988). While the Lemelson patents individually disclose two significant elements found in Wagenseil, neither teaches a combination of the two. Wagenseil, on the other hand, provides a visualization of the very combination missing in the Lemelson patents. *See In re Jerabek,* 789 F.2d 886, 890 (Fed.Cir.1986) (no cited prior art taught the combination present in the withheld reference, thus the reference was highly material).

Moreover, none of the other prior art references taught the ability to bypass machines or to recirculate within the system. Wagenseil discloses the bypass feature with the bifurcated arrows at the machine locations. Wagenseil also discloses the ability to recirculate with the re-entry of a workpiece. Because Wagenseil discloses elements that went beyond those found in other cited art, but similar to the claims contained in the U.S. System 24 application, the Court is persuaded that it was not merely cumulative.

■■■■ Plaintiff also argues that Wagenseil was not material because it was disclosed in the re-examination proceedings of the '563 patent, and the U.S. PTO still issued a re-examination certificate for the '563 patent. The Court must consider all aspects of the

---

14. During the United States prosecution of Case III, a PTO Office Action rejected the Case III claims under 35 U.S.C. § 103, over a combination of two Lemelson patent references. Stipulation 9.13. One of the Lemelson patents was directed to an automated warehouse system while the other was directed to an automated machining system. The examiner believed, when taken together, the Case III claims had to be rejected in light of their grandfather patent application filed in 1954.

patent prosecution to make a determination of a reference's materiality. As discussed in *J.P. Stevens*, the starting point for determining the materiality of a reference is the PTO standard and actions taken at the PTO. *J.P. Stevens & Co.*, 747 F.2d at 1562. In *Stevens*, the Court instructed:

> [T]he result of a PTO proceeding that assesses patentability in light of information not originally disclosed is of strong probative value in determining whether the non-disclosed information would have been material.

*Id.* In this regard, the *Stevens* Court found the district court erred by not considering the reissue proceeding that had taken place where the prior art originally not disclosed was placed squarely before the PTO. *Id.*

Although the Court recognizes that the PTO did not reject any claims based on the Wagenseil reference during the re-examination proceeding, the Court concludes that the PTO re-examination proceeding was not determinative of materiality for several reasons. First, the proceeding was undertaken for the specific purpose of determining the patentability of the '563 patent in light of several IBM patents, without consideration of Wagenseil. There is no evidence that the U.S. PTO actually considered the Wagenseil reference. Second, Wagenseil was only one of many references submitted to the U.S. PTO for the first time during the re-examination proceeding. Plaintiffs cannot be permitted to bury the Wagenseil reference in a disclosure of more than 80 references, and then argue against its materiality because claims were allowed in spite of it. Significantly, the examiner did not have the advantage during the re-examination proceeding, as does the Court, of having the development history of the patent before it.

It is these factors that convince the Court that the examiner in the re-examination proceeding did not accord the Wagenseil reference serious consideration. Unlike *Stevens*, Wagenseil was not "squarely before" the examiner. Therefore, the Court concludes that

the re-examination proceeding has no bearing on the materiality of Wagenseil.

### 2. Whitson's, Smith's, Hirsh's Intent to Deceive U.S. PTO

Next, the Court must consider whether Whitson, Smith, or Hirsh knew of the materiality of Wagenseil and acted with the intent required to establish a defense of inequitable conduct.

### a. *Whitson's Intent to Deceive U.S. PTO*

■ Defendants assert that Whitson, as the patent agent for Molins, concealed Wagenseil from the U.S. PTO in relation to the U.S. Batch claims. Defendants also argue that Whitson concealed Wagenseil in relation to the System 24 Claims. The Court agrees.

Whitson was an experienced patent agent. By 1968, Whitson was a seasoned patent practitioner. He headed Molins' patent department for 7 years, from 1974 to 1981. Whitson was knowledgeable not only regarding British patent practice, but United States patent practice as well. With all of this expertise, Whitson was certainly aware of the scope of the duty of candor that he owed to disclose material information to the U.S. PTO.

Although Defendants have not produced direct evidence of Whitson's intent to deceive, i.e. there are no "smoking memos" implicating bad faith on the part of Whitson, the overwhelming circumstantial evidence presented in this case leaves little doubt that Whitson intentionally concealed the Wagenseil reference from the U.S. PTO knowing that it was highly material to the U.S. applications.

Whitson knew, as early as April 11, 1968, the day he abandoned the Austrian Batch Process application, that Wagenseil was not only material to the Batch Process claims, but actually anticipated them. At trial, Whitson testified that a claim which was highly material in one country would likely be considered material by any patent office where the same or similar claims were pending.[15] Thus, from April 11, 1968 to August,

---

**15.** At trial, Whitson testified as follows regarding the relevancy of a reference in one country when

it is found to anticipate a claim in another country:

1969 at which time Whitson decided to abandon all foreign batch process claims, Whitson knew that Wagenseil would likely be considered important in the prosecution of the U.S. applications. Yet, Whitson never cited Wagenseil to the U.S. PTO in the 13 years (1968–1981) in which he was involved in prosecuting the U.S. applications.

Plaintiff Molins asserts that Whitson acted in good faith in not disclosing Wagenseil to the U.S. PTO. Plaintiff alleges that Wagenseil was overlooked because Whitson was overseeing so many patent applications in so many different countries. The Court finds such an assertion unbelievable. Whitson or his associates were focused on Wagenseil in the foreign applications for over ten years. The Wagenseil reference was brought to Whitson's attention on numerous occasions. It is hard to believe under such circumstances that Wagenseil somehow slipped through the cracks.

Further, Plaintiff Molins presented evidence that Whitson did consider the Wagenseil reference in regard to the U.S. Case III application at the time he made the decision to abandon the foreign applications. In a recommendation to W. Powley, Whitson's superior, to abandon all "batch process" cases because of Wagenseil, Whitson made a notation clearly indicating that the U.S. application was not to be abandoned. The notation was made because the U.S. application, unlike the foreign application contained both Batch Process and System 24 claims. Whitson was concerned that the systematic abandonment of the batch process cases would result in the accidental abandonment of the System 24 case. But, the significant fact here, is not whether the U.S. application should have been abandoned, but whether Wagenseil should have been disclosed. It is the Court's view that this letter clearly negates Plaintiff's contention that Wagenseil just fell through the cracks in the U.S. prosecution.

Plaintiff Molins presents a second "good faith" type argument. Molins alleges that Whitson did not disclose Wagenseil to the U.S. PTO because the Batch Process claims were abandoned in the U.S. leaving only System 24 claims. The Court is not persuaded by this argument either. First, the U.S. application contained Batch Process claims that were prosecuted by Whitson through the issuance of the '563 patent. Second, as the Court concluded above, Wagenseil was highly material to the System 24 application, and Whitson knew of its materiality.

In 1968, at the time Whitson abandoned the first foreign application because it was anticipated by Wagenseil, Case III was pending in the United States. Case III was a combination of the Batch Process (Case I) and the System 24 (Case II) applications. At that time, Case III contained four batch claims (claims 66, 67, 68 and 69).[16] Following the restriction requirement in June 1969, two of the batch claims remained in the application but were not being prosecuted. The two other batch claims that were present in the application were being prosecuted by Whitson as two of three independent claims.

Q. Now, Mr. Whitson, I would like to move to another topic, and that is I would like to ask you generally about claim scope and prior art.
A. Yes.
Q. While you were prosecuting the Williamson applications—and I am referring both to the Batch case and to the System 24 case—in the late sixties—
A. Yes.
Q. You knew at that time that if a prior art reference anticipated a claim, that that was a relevant reference, did you not?
A. Yes.
Q. And that if it anticipated the claim in any of the countries where you were prosecuting these counterpart applications, you knew that that was a relevant reference?
A. For all countries?
Q. Yes.
A. Well, to a certain extent, yes.
Q. And it would certainly be a reference which you would have disclosed to your U.S. attorney at that time?
A. Yes.
Q. And if you found a reference in one country in that time period which rendered the claims in that country obvious, that is another reference which you would have give to John Smith to advise you on?
A. Yes.
Trial Transcript, pp. 43–44.

16. Although Plaintiff Molins characterizes 68 and 69 as apparatus claims, not batch process claims, in its post-trial brief, Plaintiff's witnesses acknowledged at trial that claims 68 and 69 were batch-type claims.

In 1970 a patent examiner required Case III to be amended to show that it was a continuation in part as opposed to a continuation because the application contained both Batch Process and System 24 claims. Thus, from December, 1967 to October, 1970 while the Case III application was pending, batch claims were present. Accordingly, Plaintiff's argument that Wagenseil was not material to the U.S. application because it contained only System 24 claims, is without merit. Whitson was actively prosecuting batch claims in the U.S. PTO that he contemporaneously determined in foreign prosecutions were anticipated by Wagenseil.

In addition, in October 1970, Case IV was filed by Whitson and Smith as a continuation of Case III. At that time, the non-elected batch claims from Case III were reinserted into Case IV as claims 79 and 80. Once again, Whitson was attempting to obtain a U.S. patent on claims that he had contemporaneously determined were unpatentable over Wagenseil, without giving the U.S. PTO the opportunity to consider Wagenseil.

There is one more significant aspect of the U.S. prosecution that highlights the background of fraudulent intent on the part of Whitson. On June 6, 1969, the U.S. patent examiner required Molins to elect to prosecute one of four groups of claims. The claims were roughly separated into apparatus and method claims. Plaintiff's argument is that because Molins did not elect to prose-cute the Batch Process claims at that time, there was no reason to disclose Wagenseil as a material prior art reference. However, the file wrapper shows that Whitson, through Smith, only provisionally elected to prosecute certain claims. In their response, Whitson and Smith argued that a restriction to one set of claims was inappropriate; an argument that they would not have been able to make had Wagenseil been before the U.S. PTO. Accordingly, even if the Wagenseil reference were not material to the System 24 claims, the Court finds that Whitson acted inequitably in not disclosing Wagenseil at the time he argued to keep the Batch Process claims in the application.

Molins' final argument is that Whitson did not act with an intent to deceive because Whitson viewed the U.S. System 24 application as being different from the foreign applications. This argument is likewise without merit. Whitson's knowledge of the materiality of Wagenseil is demonstrated by his involvement in the prosecution of the German System 24 application. In the prosecution of the German application, Whitson stated that Wagenseil was the most material prior art reference.[17] Moreover, Whitson distinguished the German System 24 claims over Wagenseil by reference to a storage means and a reverse movement feature; neither of which were present in the U.S. System 24 claims.[18]

---

**17.** On March 8, 1972, Whitson, through Molins' German Patent Counsel, made the following statement to the German Patent Office in response to an Office Action on the pending German System 24 application:

With regard to the examiner's request to specify all the publications cited in opposition in the proceedings before Patent Offices of other countries, let it herewith be known that, in the opinion of the applicant, the article "America's First Tape–Controlled Production Line," in "Metalworking Production," July 12, 1958, Pages 1039FF, comes closest to the subject of the application. Other publications cited in opposition in other countries will be disclosed in the next few days.

K–42, pp 114–115.

**18.** In order to distinguish the amended main claim over the Wagenseil reference, Molins' counsel went on to describe two features which distinguish the invention over Wagenseil:

One feature consists of the fact that a supply stock (storage) is provided for the pallets carrying the workpieces where any number of pallets can be stored and await their use on demand. However, the second feature which is expressed in the second clause of the characterizing part of the new main claim is even more important. According to this feature, the individual pallets can be conveyed not only from the storage to the individual machine tools, but they can also be sent back at any time from the individual machine tools to their assigned location in the storage. In contrast with a known installation it is, therefore, possible to *return* the pallet within the installation. On the basis of this feature, the subject of the present patent application differs fundamentally from the principle of traditional production lines where the workpieces or *pallets always travel* through the machine tool installation in *only one direction.*

K–42, p. 117 (emphasis in original), Tr. pp. 142–144.

During this same time period, Whitson assisted in the amendment of the United States application to include claim 180. Claim 180 was the same as or substantially similar to the preamble to the German application. Dr. Haas testified that Wagenseil completely anticipated Claim 180. Furthermore, no attempt was made by Molins to distinguish Claim 180 over Wagenseil using the storage means and reverse movement features.

On the evidence presented here, the Court finds that the circumstantial evidence of intent in this case is abundant and substantial.[19] *Hewlett–Packard Co.*, 882 F.2d at 1562. Whitson knew of the materiality of the Wagenseil publication in foreign prosecutions, and still decided not to disclose it. As stated in *J.P. Stevens:*

> Whether [a reference] should have been disclosed under those rules in those lands has no controlling effect on whether it should have been disclosed to the PTO here. That [a reference] was cited and claims were rejected on [that reference] in applications corresponding to the [United States] applications should have caused a reasonable applicant to have so recognized its materiality in the PTO as to have led to its disclosure. No requirement exists to disclose to the PTO all references cited against foreign corresponding applications; *yet in the present circumstances the failure to cite [the reference] in light of its citation in foreign lands is strong evidence of intent to mislead.*

*J.P. Stevens*, 747 F.2d at 1561 (emphasis added). Thus, the Court concludes that the evidence supports a finding of an intent to mislead because Whitson was repeatedly reminded of the Wagenseil reference and its materiality and yet failed to disclose it to the

U.S. PTO. Based on the totality of circumstances, the Court concludes that the Defendants have proven by clear and convincing evidence that Whitson's failure to disclose Wagenseil was intentional. *J.P. Stevens*, 747 F.2d at 1560; *Hewlett–Packard Co.*, 882 F.2d at 1562.

### b. Smith's Intent to Deceive the U.S. PTO

Defendants allege that the actions of Smith also constituted inequitable conduct because he intentionally concealed information from the U.S. PTO on at least two occasions. First, Defendants argue that Smith had knowledge of Wagenseil and a duty to disclose the reference during the prosecution of the Williamson patents. Second, Defendants argue that Smith had a duty to disclose Wagenseil during the re-examination of the '563 patent.

### (1) Smith's Failure to Disclose Wagenseil During Williamson Prosecution

Smith denies that he ever heard of, saw, or obtained the Wagenseil reference prior to the issuance of the '563 patent. Stipulation 10.-68.[20] Defendants, on the other hand, argue that given the close and continuing relationship between Smith and Whitson, and Whitson's involvement in the U.S. prosecution that Smith must have been aware of the Wagenseil article during the prosecution of the Williamson applications. After considering the evidence presented at trial, the Court concludes that the Defendants have not proven that Smith had actual knowledge of Wagenseil at the time of the Williamson prosecution. None of Defendants' witnesses could recall actually disclosing Wagenseil to Smith. Smith testified that he had no knowledge of Wagenseil until after the '563 patent issued.

---

**19.** Whitson's intent to deceive is also demonstrated by his inconsistent statements to the U.S. PTO. In all other countries where Williamson applications were pending, Whitson and his associates maintained that Wagenseil was the closest prior art, and either abandoned or attempted to distinguish the Williamson inventions over Wagenseil. In the United States Whitson claimed that Lemelson was the closest prior art. When considered in light of two other circumstances—the fact that Whitson and Smith had already amended the Williamson applications to distin-

guish over the Lemelson patents, and Molins' interests in the Lemelson patents, this misrepresentation supports a finding that Whitson acted with an intent to deceive.

**20.** When Whitson was questioned at trial about disclosure of the Wagenseil reference to Smith, Whitson indicated that even though it would have been his normal practice to disclose such information, he did not do so. Tr., pp. 43–44, 97, 99, 133–134, 171–172, 174, 176–177.

Although it seems unusual that during the time Smith and Whitson worked closely together, particularly in 1972, that the Wagenseil reference was never discussed, absent some reasonable evidence to the contrary the Court is compelled to conclude that Smith had no actual knowledge of Wagenseil prior to the patent issuing.

Actual knowledge, however, is not the only basis for satisfying the knowledge requirement. The Federal Circuit has indicated that if a person has cultivated ignorance of a reference to avoid actual knowledge that too may be a basis for finding knowledge. *FMC Corp. v. Hennessy Indus., Inc.*, 836 F.2d 521, 526 n. 6 (Fed.Cir.1987). The Court finds that when Smith was informed of the German opposition citation to several literature references in 1975, he was put on notice that prior art might exist which had not been cited to the U.S. PTO. At that time, Smith was aware that only patents had been cited as prior art in the United States. It is reasonable to infer that the fact that literature references were cited as relevant prior art in Germany should have put Smith on notice of the need to investigate further.

Smith contends he did not cultivate ignorance, but rather attempted on more than one occasion to obtain information regarding relevant prior art from Whitson. At trial, Smith testified he questioned Whitson at least three times regarding the existence of any prior art. Tr., p. 477. Smith testified that Whitson always responded that no prior art existed. Tr., p. 514. Specifically, Smith testified about a telephone conversation where he questioned Whitson about prior art after Smith learned of the 1975 German opposition. Tr., p. 514. Smith testified that he learned of the opposition through a letter from Whitson indicating an opposition had been filed and that prior art had been cited. Stipulation 10.65; C–122. Whitson's letter stated:

> The German patent application corresponding to Williamson has recently been accepted and published and has resulted in oppositions from six German companies, including A.E.G. and Siemens. No patents have been cited but a large number of literature references. Until I have got copies of all these references I cannot establish the strength of our case. If it should turn out that we have to abandon the German case it would be pointless to try to get claims of similar scope in the U.S.A. For the present I would like the interference to proceed as slowly as possible, thereby minimizing expense.

Stipulation 10.65; C–122.

According to Smith, at that time no literature references were cited in the United States System 24 application, and the only prior art cited consisted of other patents. Tr., p. 513. The following colloquy took place during trial:

Q. Mr. Smith, at that stage you did nothing to find out what those literature references were, did you?

A. Yes, I did.

I have had an opportunity to review some of the documents which are in your possession, and I believe I testified that I recalled a telephone conversation with Mr. Whitson, which is verified by subsequent correspondence—I can't recall the document numbers—but in any event it was a late August 1975 letter to Mr. Blodgett, who was counsel for Cincinnati Milacron in the interference proceedings, in which I referred to the German opposition, in which there were seven opponents, six West German and one East German, which is not the information in that letter.

And I have seen documents that have been produced by Molins which show that Mr. Whitson wasn't aware of the East German opposition, or at least one of the oppositions.

So I am confident that I learned that through this telephone conversation, and it was at that time that I asked questions about this prior art, and as I have testified before, in each instance, he informed me that there was no prior art of consequence, and I think this is verified by the fact, because there is a notation in one of those letters identifying a Lemelson patent that was already of record

I believe, and Wagenseil, which he already knew about.

. . . . .

Q. That Blodgett letter you referred to, Mr. Smith, in fact when that letter was presented to you at your deposition that is when you conceded that you must have known about the German oppositions?

A. I don't recall which letter it was.

Q. It is one letter which you wrote, isn't it?

A. Yes.

Q. And it was a letter which has never been produced from your files?

A. No, but it has been produced, I believe, if I am not mistaken—there are four documents in my files referring to this German opposition, and I don't recall which ones they are. There are two telexes and two letters.

Tr., pp. 513–516.

The Court finds that Smith's highly specific testimony regarding a telephone conversation with Whitson at the time of the German opposition lacks credibility. This finding is partly based on the fact that until presented with a document during a 1988 deposition proving Smith's knowledge of the German opposition in 1975, Smith denied knowing of the opposition until after the '563 patent had issued. Smith Deposition, Vol. 1, pp. 121–122; Vol. 3, pp. 21–22. Smith Deposition, Vol. 5, pp. 87 and 92; Vol. 6, p. 89; Vol. 8, pp. 35–36; Vol. 9, pp. 69–70, 97; Vol. 12, pp. 175–176; Vol. 15, pp. 125–126. Smith Deposition, Vol. 16, p. 5; Tr., p. 511. In light of Smith's inability to recall knowledge of the German opposition at all in 1988, and inability to recall receiving a letter until presented with the letter in 1990, the Court finds it highly unlikely that Smith would now be able to recall, with specificity, a telephone conversation sixteen years earlier relating to the materiality of prior art cited in the German opposition.

Defendants also allege that Smith cultivated ignorance when he failed to inquire about prior art after learning that the German application had been abandoned. Many times the abandonment of an application nor-mally does not indicate that material prior art existed. But, in this case Whitson wrote Smith a letter, dated June 6, 1975, informing Smith of the interference, and advising him that the defeat of the German application would adversely affect claims of similar scope in the United States.

These warnings by Whitson to Smith must be examined in light of the circumstances at the time. Smith and Whitson had a long standing working relationship during which time Smith had become familiar with Whitson's practices and abilities. Although the Court does not find that Smith inquired as to the materiality of these references, the Court is persuaded that it would have been reasonable, under all the circumstances, for Whitson to come forward with any material prior art references. Thus, although there were warnings that perhaps should have alerted Smith that references existed that were material, the Court concludes these were insufficient to show, by clear and convincing evidence, that Smith knew of or cultivated ignorance regarding the existence of Wagenseil.

Absent actual knowledge or cultivated ignorance of Wagenseil, Smith was not under any duty to disclose Wagenseil to the U.S. PTO. Thus, the Court concludes that the Defendants failed to prove by clear and convincing evidence that Smith had knowledge of the Wagenseil publication or that a duty to inquire on Smith's part arose with respect to the Williamson prosecution.

**(2) Failure to Disclose Wagenseil During the Re-examination**

▆▆ Defendants argue that Smith's failure to disclose Wagenseil during the Re-examination of the '563 patent constituted inequitable conduct. On this issue, the Court finds that Smith had knowledge of Wagenseil, had knowledge of its high materiality, and intentionally deceived the U.S. PTO in failing to disclose Wagenseil to the U.S. PTO.

Wagenseil was originally cited to the U.S. PTO during the re-examination of the '563 patent. Notably, it was not Smith who first disclosed Wagenseil; rather it was first cited in Cross & Trecker's reply brief to show the common practice of palletizing workpieces. Tr., p. 619. When Wagenseil was cited, it

was cited along with 80 or 90 other references. Tr., p. 601. Smith made no efforts to highlight Wagenseil, and its potential materiality, nor did Smith inform the U.S. PTO of Whitson's early knowledge of and reliance on Wagenseil in other countries. Tr., pp. 619–620.

Based on Smith's knowledge of Wagenseil, and of Wagenseil's materiality in the foreign prosecutions, Smith owed a duty to bring Wagenseil to the attention of the re-examination examiner. *See Penn Yan Boats, Inc. v. Sea Lark Boats, Inc.*, 359 F.Supp. 948, 965 (S.D.Fla.1972), *aff'd.*, 479 F.2d 1328 (5th Cir.), *cert. denied*, 414 U.S. 874, 94 S.Ct. 66, 38 L.Ed.2d 115 (1973).[21]

The Court finds that Smith acted intentionally because Wagenseil was initially withheld and later disclosed with a large number of other allegedly prior art references. Failing to highlight the Wagenseil reference in light of Smith's knowledge regarding Whitson's actions in the foreign prosecutions, violated the duty of candor owed to the U.S. PTO. *Penn Yan Boats, Inc.*, 359 F.Supp. at 964–965.

### c. Hirsh's Intent to Deceive the U.S. PTO

█ Defendants argue that Hirsh concealed material references from the U.S. PTO during the 1980s. Defendants assert that Hirsh did not adequately disclose Wagenseil or Whitson's admissions regarding Wagenseil to the U.S. PTO. In addition, Defendants argue that Smith and Hirsh concealed Wagenseil and its high degree of materiality when they buried it in a large stack of documents submitted to the U.S. PTO. Finally, Defendants argue that Hirsh's destruction of documents material to this litigation evidences his attempt to conceal information from the U.S. PTO.

At trial, Hirsh admitted that he was aware of the Wagenseil article. He also admitted that he owed a duty to the U.S. PTO to extract from the foreign prosecution files all relevant prior art and provide references to the re-examination examiner. Hirsh further admitted that he possessed the ability to understand foreign languages sufficiently to extract and evaluate the prior art references.

Due to his prior involvement in other United States patent litigation, Hirsh is aware of the American discovery process. Tr., pp. 233–235. Hirsh has been aware for several years of the need to preserve relevant documents and the impropriety of destroying relevant documents when litigation in the United States is contemplated. Tr., p. 235.

Upon issuance of the '563 patent in January, 1983, Hirsh undertook a review of the prosecution files from the corresponding foreign cases, all of which Molins had abandoned by 1976. Tr., pp. 237–238. The foreign files were reviewed to compare the claim coverage in foreign cases with that permitted to issue in the '563 patent. Tr., pp. 237–238.

Hirsh reviewed the German, Dutch and Japanese cases and became aware of a number of prior art references, including Wagenseil. Tr., pp. 237–238, 270–271. Hirsh notified Smith of his discovery and brought the information to the attention of E.F. McKie ("McKie"), a Washington, D.C. patent attorney. Tr., pp. 238–240; C–92.

Hirsh and Smith were concerned about the validity and enforceability of the '563 patent given that the prior art reference appearing in the foreign cases had never been cited in the United States. Tr., pp. 270–271. McKie requested information regarding the prosecution histories of the foreign applications where Wagenseil had been considered. Tr., pp. 238–239. Hirsh then sent McKie what he considered to be the relevant portions of those files. Tr., pp. 271–272; K–402. It was Hirsh's responsibility to extract relevant doc-

---

21. Obviously, the purpose of this misrepresentation was to bury the [reference] in a long list of allegedly old prior art patents in the hope that the Patent Examiner, having already allowed the [patent-in-suit] claims, would ignore the list and permit the [patent-in-suit] to issue. Such conduct clearly violates the required standard of candor and fair dealing with the Patent Office.

[The applicant] had a clear obligation to call the [reference] to the attention of the Patent Office in a proper fashion and to attempt to patentably distinguish his claimed invention from the disclosure of the [reference]. Had he done so, the [patent-in-suit] may never have issued and a substantial portion of this litigation could have been avoided. *Penn Yan*, 359 F.Supp. at 965.

uments from all of the foreign prosecution files, yet he knew no Japanese or Dutch and knew just a "little bit of German." Tr., pp. 330–333.

Following receipt of these extractions, McKie requested that Hirsh forward any documents from the foreign files showing Whitson's knowledge of Wagenseil. Tr., pp. 240. In July of 1984, Hirsh, or someone under Hirsh's direct supervision, complied with McKie's request by sending additional extracts from all foreign files. Stipulation 10.98; Tr., pp. 241–242, 253, 271–272; and K–401. Again, it was Hirsh who decided what documents were relevant to the issue and thus would be extracted. Tr., p. 275. The documents provided showed the abandonment of the Austrian, Czechoslovakian, Dutch, Canadian, Russian, Japanese and British Batch applications. Tr., pp. 241–248; K–344; K–345; K–346, K–347; K–405; K–406; and K–407. During the review process, all of the prior art documents were removed from the foreign prosecution files, even though only portions were sent to McKie. Tr., pp. 248, 241–242.

As a result of reviewing the files, Hirsh saw Whitson's comments, actions, beliefs, and knowledge regarding Wagenseil. Tr., p. 302. Hirsh knew that Whitson had abandoned foreign Batch Process applications and that Whitson had brought Wagenseil to the attention of numerous patent offices, except the United States. Tr., p. 295; K–401; K–402. Hirsh also knew that Wagenseil had been used in some foreign applications as a starting reference. Tr., p. 295. Further, Hirsh knew that Whitson had amended System 24 claims in foreign offices due to the disclosures of Wagenseil. Tr., pp. 270–274, 295–296. Thus, Hirsh knew that Whitson was aware of Wagenseil, accounted for it, amended claims because of it, and used the reverse movement feature to distinguish the System 24 invention over it. Tr., p. 296, 300. Accordingly, the Court concludes that Hirsh knew of Whitson's belief regarding the materiality of the Wagenseil reference, and the fact that it had not been disclosed to the U.S. PTO; yet Hirsh took no action to disclose Wagenseil nor Whitson's prior knowledge of the reference. Tr., pp. 301, 1049.

Given the totality of circumstances, the Court concludes that Hirsh intentionally withheld Wagenseil from the PTO. When Hirsh did disclose Wagenseil, he did so only by including it with a large number of other allegedly prior art references. As discussed earlier, this type of a disclosure does not fulfill the duty of candor and good faith owed to the U.S. PTO. *Penn Yan Boats, Inc.,* 359 F.Supp. at 964–965.

The Court is also persuaded that Hirsh's destruction of documents indicates an intent to mislead. Molins' employees testified that many of the documents which were never produced were ones that they expected would have been retained. These documents were not destroyed until after the present litigation had commenced. Under the circumstances, and in light of the information available to Hirsh, the Court finds that Hirsh's failure to bring Wagenseil to the attention of the U.S. PTO resulted from an intent to deceive.

### 3. Balancing the Materiality of Wagenseil Against Whitson's, Smith's and Hirsh's Intent to Deceive

 Having found that the thresholds of intent and materiality are present, the Court must balance Wagenseil's high materiality against Whitson's, Smith's and Hirsh's intent to ascertain whether inequitable conduct occurred. Although the inverse relationship between the materiality and intent typically is important, it is unnecessary with respect to Whitson's conduct. The Court is faced with a prior art reference of the highest materiality and circumstantial evidence demonstrating a high degree of culpability. Accordingly, the Court concludes that Whitson committed inequitable conduct by failing to disclose Wagenseil to the U.S. PTO in the prosecution of the '563 patent.

 Although the circumstantial evidence is not as overwhelming with regard to the intent of Hirsh and Smith in failing to adequately disclose Wagenseil during the reexamination proceedings, there was strong evidence of an intent to deceive. This intent balanced against the high materiality of Wagenseil convinces the Court that inequita-

ble conduct occurred. Both Smith and Hirsh were experienced in prosecuting patents in the United States. Both knew of their duty of candor to the U.S. PTO which required disclosure of all known material prior art. At the time of the re-examination of the '563 patent, both Smith and Hirsh knew the history behind Wagenseil and Whitson's failure to disclose it to the U.S. PTO. Rather than candidly disclosing this information to the examiner, Smith and Hirsh buried the Wagenseil reference by submitting it with a large group of other prior art. These circumstances point to one conclusion, i.e. that Smith and Hirsh were attempting to deceive the U.S. PTO.

### C. Smith's Failure to Disclose Lemelson Application

■ Defendants contend that Smith's conduct in prosecuting Lemelson application 107,357 supports a finding of inequitable conduct. Smith was prosecuting Lemelson's machine tool application 107,357 during the time that Williamson's System 24 application was pending. Smith failed to disclose the Lemelson application to the Williamson patent examiner. Defendant's allege that Lemelson claim 11 and Williamson claim 160 define the same patentable invention, and that Smith violated his duty of candor in not disclosing the Lemelson application to the Williamson patent examiner.

### 1. Facts Regarding Smith's Prosecution of Lemelson's Machine Tool Application

The first contact Smith had with Lemelson arose from his representation of Molins. In 1968, a Molins–Lemelson agreement was entered into whereby Molins acquired certain rights in Lemelson patents and pending applications. Stipulations 9.25 and 9.41; K–76. During the life of this agreement, Smith became involved in prosecuting certain Lemelson patents on behalf of Molins and thus became further acquainted with Lemelson. Tr., pp. 365–366. By early 1970, Lemelson was aware that Smith represented Molins in the prosecution of a Lemelson application

held by Molins under the 1968 Molins/Lemelson agreement. Stipulation 9.44.

As a result of their professional acquaintance, Smith also began prosecuting patents for Lemelson personally in 1970 or 1971. Tr., p. 366. Generally, Smith represented Lemelson on patents dealing with toy inventions and surveillance system inventions. Tr., p. 366. At trial, Smith testified that while he was a patent attorney for Molins, he would not have handled a patent prosecution for Lemelson if it read on the same type of invention that Molins was trying to patent. Tr., pp. 366–367. Thus, according to Smith, he received no objection from Molins when he sought their approval to prosecute patents unrelated to Molins' interests for Lemelson. Tr., pp. 366–367. Whitson, although he did not remember being asked, indicated he would have approved of Smith prosecuting unrelated applications, but would have objected if the subject matter overlapped Molins' interests. Tr., pp. 191–192. Hirsh, who succeeded Whitson, stated he was surprised when, in 1990, he learned Smith had represented Lemelson on patent applications similar in nature to those being sought by Molins. Tr., pp. 313–314.

On January 18, 1971, Lemelson filed *pro se* application serial number 107,357 entitled "Machine Tool System" which was a CIP of two other applications. Stipulation 9.43; C–207. One of the applications had resulted in the 3,854,889 patent which was owned by Molins and prosecuted by Lemelson. On January 24, 1973, the patent examiner rejected the 107,357 application in view of the '540 patent and the Perry patent. C–207, p. 37.

In February of 1973, Lemelson asked Smith to solicit the interest of Molins in his *pro se* 107,357 application. Stipulation 9.45; C–263; Trail Transcript, pp. 536–538. By letter dated February 7, 1973, Smith informed Whitson of Lemelson's request, C–263, and told Whitson he would not spend any time on Lemelson's application without Whitson's approval. C–263. Further, the letter stated that Smith had learned that Lemelson might assert a 1954 priority date and thereby possibly give Molins rights in the application without further agreement.[22]

---

22. The 1954 priority date refers to the 449,874 application filed by Lemelson on July 28, 1954.

C–263; Tr., pp. 539–540. Whitson responded by letter on February 13, 1973, indicating that either the patent was covered by the Molins–Lemelson agreement or it involved automatic warehousing. M–481. On February 23, 1973, Smith wrote Whitson stating he believed that if Lemelson claimed a 1954 priority date, the patent would be governed by the Molins–Lemelson agreement. M–482.

In March of 1973, Lemelson gave Smith a copy of the 107,357 application and requested that Smith review it and forward it to Molins; which Smith did. Stipulation 10.73. Lemelson also gave Smith a handwritten sheet of notes that outlined how Lemelson thought he might be able to claim a priority date of 1954. C–207, pp. 12 and 36; Tr., pp. 551–554. On March 9, 1973, Smith wrote Whitson to inform him that Lemelson had requested that Smith assume responsibility for the prosecution of his 107,357 application and Smith's views on a possible conflict of interest between Smith's continued representation of Molins and the proposed representation of Lemelson. Stipulation 9.46. Enclosed with the letter was a copy of the 107,357 application. C–207, p. 6.

On March 13, 1973, Whitson responded by letter that he agreed with Smith that a conflict of interest would exist if Smith handled the Lemelson application. Stipulations 9.48 and 10.75; M–470; C–207, pp. 8–9. In the letter, Whitson wrote that "one of the questions on which you would have to advise Mr. Lemelson is whether or not to rely on application 449,874 to overcome the references." C–207; M–470. Thus, Whitson concluded that Smith's representation of Lemelson would put Smith in an impossible situation. C–207; M–470. After receipt of Whitson's letter, Smith advised Lemelson by letter dated March 21, 1973, that he would be unable to prosecute the 107,357 application. Stipulations 9.49 and 10.76. Smith told Lemelson:

[T]here clearly would be a conflict of interest and I am certain that I would find occasion where action I would take with respect to this application would not be in your best interest if it were in the best interest of Molins or vice versa.

Stipulations 9.49 and 10.76; M–472; C–207, p. 14. On the same day, Smith wrote Whitson to inform him he would not be representing Lemelson. M–471. In that letter, Smith stated that unless and until Lemelson asserted a 1954 priority date, Molins did not have a license in the 107,357 application under the Molins–Lemelson agreement. M–471.

In May and June of 1973, Smith wrote Lemelson inquiring as to the status of the 107,357 application. M–487 through M–490. On May 31, 1973, Lemelson filed a response to the earlier Office Action asserting, for the first time, a 1954 priority date. K–484, p. 5071. Lemelson wrote Smith on September 21, 1973, indicating that he would prosecute the 107,357 application himself. Stipulation 9.50.

On June 24, 1974, the patent examiner issued an Office Action rejecting the 107,357 application over the '540 and Perry patents. Stipulation 10.77; C–207, p. 162. On October 25, 1974, Smith signed, on Lemelson's behalf, a paper requesting an extension of time in responding to the June 25, 1974 Office Action.[23] In November of 1974, Smith filed a response to the June, 1974 Office Action. Stipulation 10.78; C–207, p. 191. On July 29, 1975, the U.S. PTO once again rejected the 107,357 application over Perry and the '540 patent. Stipulation 10.79.

On November 14, 1975, Smith sent Lemelson a proposed response to the July, 1975 Office Action in which Smith stated:

I have pointed out in the remarks that there is support for the central control

---

Stipulation 9.39. The 449,874 application was one in which Molins was granted a non-exclusive license under the 1968 Molins–Lemelson agreement.

23. According to Smith, once Lemelson decided to assert the 1954 priority date, Smith informed Whitson of this fact, and that Smith would begin prosecution of the application because under the Smith–Molins agreement, Molins had an interest

in the application. Trial Transcript, pp. 416–417, 565. However, Whitson and Hirsh, as previously noted, both said they would have been or were surprised to find that Smith had undertaken representation of Lemelson. The Court finds the testimony of Whitson and Hirsh more credible than that of Smith and thus finds that prior to representing Lemelson, Smith had not received approval from Molins.

means in your earlier application dating back at least to 1964, and thus antedating the Fair et al and Perry et al patent references which are the earliest references disclosing a central control means.

C–207, p. 100. On November 21, 1975, Smith argued to the U.S. PTO that Lemelson was entitled to priority based on the 1964 application which could then be related back to the 1954 application. C–207, p. 215. On July 29, 1975, the U.S. PTO once again rejected the Lemelson application based on the '540 and Perry patents. C–207, p. 171.

Smith appealed the July 1975 rejection, but on August 31, 1979, the PTO Board substantially upheld the earlier decision. C–207, p. 180ff. The Board did not, however, decide whether Lemelson was entitled to an April 8, 1965, priority date on the basis of application 465,812 which became the '014 patent and later reissued as the '770 patent.

On November 6, 1979, after the Board's decision, Smith abandoned applications 107,-357 and filed CIP application 91,908. C–208. On April 4, 1981, Smith filed application 251,-656 as a continuation of the 91,908 application which was then abandoned. Stipulations 9.57 and 10.80; C–209.

On November 25, 1981, Smith filed an amendment to Lemelson 251,656, adding a set of claims which included Claim 11.[24] Stipulation 10.86; C–209, p. 367. C–209, p. 268. The U.S. PTO rejected Claim 11 on

November 10, 1982 as anticipated by the '540 patent and Perry. Stipulations 10.86 and 10.87. On February 10, 1983, approximately two weeks after the Molins '563 patent issued, Smith for the first time asserted January of 1954 as the priority date of Claim 11 based on the 449,874 Lemelson application. Stipulations 9.37 and 10.91. Smith argued that Lemelson had made a constructive reduction of the Claim 11 invention as early as January of 1954, the date of Lemelson's application 449,874 filing. Stipulation 10.91. Smith told Lemelson that for priority in the 251,656 claims they could rely on the disclosures of Lemelson's 3,313,014 patent which was filed on April 8, 1965. Stipulation 10.92. It is worth noting that April 8, 1965 is prior to any effective date of invention to which any asserted claims of the Williamson '563 patent in suit is entitled.[25] Stipulation 10.93.

On August 28 or 29, 1984, Lemelson asked Smith to return his files, and Smith did so on September 14, 1984. Stipulation 10.95. Lemelson revoked Smith's power of attorney regarding the 251,656 application on September 18, 1984. Stipulations 9.58 and 10.96. Sometime in September or October of 1984, Lemelson gave power of attorney to prosecute the 251,656 application to Neil Markva. Stipulation 9.59.

On May 30, 1986, claim 11 of the Lemelson 251,656 application was rejected by the U.S.

---

**24.** Claim 11 read as follows:

*Claim 11:* *(Amended) An automatic production system comprising in combination:*

first conveying means for supporting and carrying a plurality of pallets, each containing at least one unit of work, in a given direction defining a production line.

a plurality of production tools disposed adjacent said first conveying means, with each tool being operable to perform programmed operations on work presented thereto,

a plurality of pallet transfer units disposed adjacent said conveying means for engaging pallets on said first conveying means and for transferring said pallets to respective of said tools,

master control means for generating command control messages and means for applying said command control messages to respective of said pallet transfer devices and said tools in a manner to effect the transfer of selected work holding pallets to selected of said tools and to control the programmed operation of said selected tools on work held by said pallet and to further effect the

transfer of said pallet and work back to said conveying means after programmed operations have been performed on the work held by said pallet by said tools.
C–154.

**25.** It is worth noting that during the prosecution of the Williamson application, Smith argued that the Lemelson prior-art citations ('014 and '501 patents) could be overcome because they did not suggest the combination of a storage and production system that had a central computer controller. (K–28, p. 205–209; K–59C, p. 334; Trial Transcript, pp. 1126–1128). Then, during the prosecution of the Lemelson application, and a few days after the '563 patent issued, Smith argued that support could be found for a master control means controlling more than one machine tool in Lemelson's 1954 application. (C–209, p. 377; Transcript, pp. 439–440; Trial Transcript, pp. 1124–1126 and 1128–1131). Thus, the Court finds that Smith was put in a position of taking opposite stands while prosecuting the Williamson and Lemelson applications.

PTO. Stipulations 9.60 and 10.100. In the rejection the examiner stated that the Lemelson claims were anticipated by the '540, Perry and Williamson '563 patents. Stipulations 9.60 and 10.100. This was the first time in the prosecution of application 251,656 that the Williamson '563 patent had been cited as grounds for rejecting Lemelson's application. Stipulations 9.60 and 10.100.

On May 13, 1987, Markva, on behalf of Lemelson, filed application 49,381 as a continuation of 251,656, and copied claims of the Williamson patent, requesting that an interference between the Williamson '563 patent and the Lemelson 49,381 application be declared. Stipulation 9.64. On November 11, 1987, Markva, on behalf of Lemelson, filed application 126,319, and copied claims of the Williamson patent, requesting that an interference between the Williamson '410 patent and the Lemelson 126,319 application be declared. Stipulation 9.65.

At all relevant times from November of 1974 until Lemelson revoked Smith's power of attorney on September 19, 1984, Smith prosecuted Lemelson's applications. Stipulations 9.59 and 10.96; C–204; C–211. During this time, Molins' United States applications were also being prosecuted by Smith. At no time during the prosecution of the Molins application did Smith inform the Williamson patent examiner of the Lemelson application, nor did Smith inform the Lemelson examiner of the Williamson application.

### 2. Materiality of Lemelson Application 107,357 and Smith's Intent to Deceive the U.S. PTO

Defendants contend that Smith was under an obligation to disclose Claim 11 to the Williamson examiner because they contend that Claim 11 of Lemelson application 251,-656 and Claim 160 of Williamson '563 deal with the same subject matter. Plaintiffs on the other hand argue that the two claims do not read on the same invention. *See* C–154 and C–141. Plaintiffs assert two primary differences between the two claims. First,

there is no source of workpieces in Claim 11 while there is such a source in Claim 160. Second, Plaintiffs contend that the "master control means" present in Claim 11 do not disclose the same invention as the "central programmed control means and data link" found in Claim 160. Moreover, Plaintiffs argue that a determination of whether the two claims read on the same invention must take into account not only the language of the claim, but the specification and the file wrappers of the applications.

The Court does not need to address whether or not claims 11 and 160 read on the same invention.[26] The Court is satisfied from the language of the claims, and the prosecution history of the two applications that the disclosures are substantially similar.[27] Defendant's expert testified that, given this similarity, a reasonable patent examiner would consider the Lemelson application important in the prosecution of the Williamson application. The Court agrees with the Defendants' expert. The U.S. PTO rejected Lemelson's application over the Fair patent and Perry application; the same two prior art references involved in the Williamson/Perry/Fair interference proceedings. This is strong evidence that Lemelson's application disclosed the same invention as Perry and Fair, which disclosed the same invention as Williamson. Accordingly, Lemelson's application was highly material to the Williamson prosecution.

Therefore, the only inquiry left for the Court is whether Smith's nondisclosure resulted from intent to deceive the U.S. PTO. While the simultaneous prosecution of the two applications may have been ethically improper, this alone does not amount to inequitable conduct. Such dual representation is, however, probative on the issue of intent. Smith was aware of his duty to disclose any information that a reasonable patent examiner would consider important to the prosecution. The fact that Smith was arguing two inconsistent positions and the similarity of the two applications persuades the Court

---

26. On May 17, 1990, a patent examiner rejected the Defendants' argument that Claim 11 disclosed the same type of source as Williamson Claim 160. C–210, p. 4918.

27. When Smith was deposed, he agreed that the Lemelson patent inherently contained a source of workpieces. Smith Deposition, Vol. 10, pp. 68–70.

that Smith acted with an intent to deceive the U.S. PTO. This intent balanced against Lemelson's high materiality leads the Court to conclude · that inequitable conduct occurred.

### D. Whitson's Failure to Disclose Lemelson '247

#### 1. Materiality of Lemelson '247

■ The materiality of Lemelson '247 in the prosecution of the '563 patent can hardly be questioned. On June 28, 1978, the U.S. patent examiner reviewing the Case IV application cited '247 as relevant art. K–59C, p. 294. Moreover, on March 14, 1979, the U.S. examiner rejected Molins' claims in part because of Lemelson '247. K–59c, p. 359. Thus, the Court finds that a reasonable patent examiner would have considered Lemelson '247 important prior art in determining the patentability of the Williamson inventions.

#### 2. Whitson's Knowledge of Lemelson '247 and Intent to Deceive U.S. PTO

Whitson first became aware of Lemelson '247 in March 1973, at which time Smith sent him a copy of the patent. On October 24, 1974 the Japanese Patent Office rejected System 24 claims as disclosed by a combination of Lemelson '247 and Wagenseil. Whitson was informed of the Japanese rejection by a letter from the Japanese patent agent dated June 24, 1975. K–52. Benziger testified that he discussed the Japanese rejection with Whitson at that time. Benziger Deposition, Vol. II, pp. 129–30.

Whitson responded to the Japanese rejection by attempting to distinguish the System 24 invention over Wagenseil on the grounds that Wagenseil did not disclose a reverse movement feature. The Japanese examiner did not accept this distinguishing feature, however, and issued a final rejection based on the Wagenseil–Lemelson '247 combination. In the final rejection notice, the examiner explained in detail the disclosures of Lemelson '247 and how it, combined with Wagenseil, rendered the System 24 application unpatentable. K–52. Thus, as of October 29, 1974, Whitson was aware of Lemelson '247 and of its high materiality to the System 24 application. The Court concludes that this awareness coupled with the ˙surrounding circumstances is sufficient evidence of Whitson's intent to deceive the U.S. PTO.

Whitson had · System 24 applications around the world. He testified that in his systematic prosecution of counterpart applications in many countries prior art found to be material in one country was cross-referenced in other countries. He also testified that he attempted to work the counterpart applications in parallel, meaning that if an amendment were made to one application, the same amendment would likely be made in all applications. ·

Thus, when Whitson was informed that the Japanese System 24 application was anticipated in part by Lemelson '247, he most likely would have considered the implications of that decision with regard to other counterpart System 24 applications, including that pending in the United States. Whitson knew that a reference that was used to anticipate a claim in a foreign country would be relevant in the counterpart prosecution in the U.S. Yet, even when faced with the rejection of the System 24 application over Lemelson '247, Whitson did not disclose it to the U.S. PTO. At a minimum, this constitutes gross negligence. When considered in light of the failure to disclose Wagenseil, and other evidence of inequitable conduct presented to the Court, the Court concludes that the threshold of culpability has been satisfied.

#### 3. Balancing the Materiality of Lemelson '247 with Whitson's Intent to Deceive

Given the high materiality of the Lemelson '247 patent, and the overwhelming evidence of Whitson's awareness of this materiality, the Court is convinced that inequitable conduct occurred. The Plaintiff has offered no justification or evidence that would indicate that Whitson's conduct was motivated by anything other than an intent to deceive the U.S. PTO.

### E. Whitson's and Smith's Failure to Disclose Lemelson '014 and Lemelson Reissue 26,770

■ Defendant's also allege that Whitson and Smith did not disclose Lemelson '014 and Lemelson Reissue 26,770 to the Williamson patent examiner, and that this failure constituted inequitable conduct. The Court agrees.

#### 1. Whitson's and Smith's Knowledge of Lemelson '014 and Reissue 26,770

Beginning in 1967, Whitson, on behalf of Molins, engaged in negotiations with Jerome Lemelson to acquire rights in Lemelson's patents in the field of machine tools. Tr., p. 58. Molins acquired Lemelson '014 in 1968 as a result of these negotiations.

In 1968 Smith was involved it the prosecution of Lemelson '014, and later prosecuted the Reissue 26,770 in April 1968. Tr., pp. 181, 375. Reissue 26,770 is a reissue of Lemelson '014. Therefore, both Smith and Whitson were intimately acquainted with the Lemelson '014 and Reissue '26,770 and their disclosures.

#### 2. Materiality of Lemelson '014

Lemelson '014 discloses an automatic production system where a plurality of machines with a programmable conveyor delivers and retrieves workpieces to and from selected production machines. The materiality of Lemelson '014 is highlighted by the fact that the U.S. PTO relied upon a combination of Lemelson '014 and Lemelson '501 in rejecting Molins' System 24 claims. Although this reference does not anticipate each claim in the patents in suit, the Court finds that a reasonable patent examiner would consider the reference important.

#### 3. Whitson's and Smith's Intent to Deceive U.S. PTO

Once again, the Defendants are unable to produce direct evidence of intent. Nonetheless, the Court finds that under the totality of the circumstances, Whitson and Smith's nondisclosure of Lemelson '014 resulted from an intent to deceive.

First, prosecution history of the '563 patent illustrates that Whitson and Smith established a practice of not disclosing relevant prior art of which they had knowledge. Second, during the application for Reissue 26,770, Whitson and Smith reviewed Lemelson '014 claim by claim and reconsidered all of the prior art. Finally, Whitson and Smith acknowledged in a contemporaneous correspondence that they were not surprised that claims in the Williamson application were rejected over Lemelson '014 and Reissue 26,770. This statement, considered in light of the surrounding circumstances leads the Court to conclude that Smith and Whitson were aware of Lemelson's '014 high degree of materiality, and did not disclose it with the intent of deceiving the U.S. PTO. Balancing materiality and intent in this regard is not necessary. Lemelson's patent was highly material and there is strong circumstantial evidence of an intent to deceive. Thus, Whitson's and Smith's failure to disclose Lemelson '014 constituted inequitable conduct.

### F. Whitson's False Declaration

■ Defendant's final contention is that Whitson filed a knowingly false declaration when Smith amended the Case III application from a continuation to a CIP. The declaration required in the filing of any application contained a signed statement by Williamson that all the known material prior art had been disclosed to the patent examiner. This declaration was filed, after Whitson had begun abandoning foreign Batch Process applications because of Wagenseil, and before Wagenseil was disclosed to the U.S. PTO.

While the Court certainly does not condone the filing of false declarations, even negligently, the filing of this declaration did not rise to the level of inequitable conduct. The filing of the declaration in the amendment of an application from a continuation to a CIP is more of a ministerial act than when the declaration is filed with the initial application. There is not sufficient evidence for the Court to find the necessary threshold of intent. While surely, the filing of this false declaration is another example of the overall deceptive conduct on the part of Whitson and

Smith, it by itself does not warrant an alternative finding of inequitable conduct.

## G. Hirsh's Destruction of Records

■ Defendants' final contention is that Hirsh's conduct with respect to this litigation warrants finding that this is an exceptional case. As early as July of 1984, Hirsh knew of Whitson's awareness of Wagenseil. Tr., p. 240. By 1984, Hirsh was contemplating bringing suit against Avco, one of the Defendants in the current litigation. Tr., p. 274; C–5.

In 1986, the foreign prosecution files of Molins were destroyed. Tr., p. 251; Hirsh Deposition, Vol, I, pp. 24–27, 30. Prior to this time the System 24 files had been separated out for review. Tr., p. 334. All of the Williamson foreign prosecution files, once separated, were kept in the office of Molins employee, Fred Groom, where they occupied a large part of the office. Tr., p. 250. Groom stated that the foreign prosecution files were brought to his office and left there until "days or weeks" before Molins moved offices at the end of November, 1986. K–238.

Plaintiffs filed suit against Textron on September 22, 1986. Stipulation Fact 2.1. On October 10, 1986, Defendants made their first request for the production of foreign counterpart files to the patents in suit. Stipulation 10.110.

Although it was not necessarily the normal practice for Molins to microfilm all of the prosecution files, certain documents were microfilmed prior to November 1986. Tr., pp. 258–260. Dieter Benziger, a Molins employee and assistant to Whitson, testified at trial that some documents that were not microfilmed were destroyed subsequent to Molins' move. Benziger deposition, Vol. III, p. 39. Further, Benziger stated that he thought the System 24 application prosecutions were important and would have expected them to be microfilmed. Benziger Deposition, Vol. III, pp. 39–40. None of the System 24 foreign applications were microfilmed. Tr., p. 258.

During the critical time period of February 1972 to April 1972, the German Office Action response occurred and claim 180 of the '563 patent was filed by Whitson and Smith. Tr., pp. 283–289. In addition, Whitson traveled to see Smith during this period to amend the pending United States application. Tr., p. 287.

Hirsh has acknowledged that the German response of February 1972 is relevant to this litigation, Tr., pp. 268–269), yet the February, 1972 German response was never produced from the McKie file. K–357.

Hirsh acknowledged at trial that the German response would have been a file he would have expected to have been sent and that he could not explain the absence of it from the files sent to McKie. Tr., pp. 285–290. However, he further testified that he did not recall seeing this document in the files and that it would have been a document he would have preserved if he had seen it. Tr., pp. 328–330.

Once Hirsh had extracted what he considered to be the relevant portions of the foreign prosecution files the remains were eventually destroyed. Tr., p. 253. While making extractions from the foreign files, Hirsh indicated that he knew enough German to recognize a reference to, and a description of, the prior art. Tr., p. 333.

Attorney fees may be awarded to the prevailing party in a patent case if the Court finds the case to be exceptional. 35 U.S.C. § 285. In deciding if fees are to be awarded, a four part standard has been developed by the Court of Appeals for the Federal Circuit: "(1) the case must be exceptional, (2) the district court may exercise its discretion, (3) the fees must be reasonable, and (4) the fees may be awarded only to the prevailing party." *Machinery Corp. of America v. Gullfiber AB,* 774 F.2d 467, 470 (Fed.Cir.1985).

Initially the Court must determine if the case is exceptional, and if it is, then determine if this case warrants such an award. *J.P. Stevens Co., Inc. v. Lex Tex, Ltd., Inc.,* 822 F.2d 1047, 1050 (Fed.Cir.1987). The Court, in determining if a case is exceptional, must find some "unfairness, bad faith, inequitable conduct, vexatious litigation or some similar exceptional circumstances." *Multi–Tech, Inc. v. Components, Inc.,* 708 F.Supp. 615, 620 (D.Del.1989); *A.B. Chance Co. v.*

*RTE Corp.*, 854 F.2d 1307, 1312 (Fed.Cir. 1988); *Reactive Metals & Alloys Corp. v. ESM, Inc.*, 769 F.2d 1578, 1583 (Fed.Cir. 1985); *Stevenson v. Sears, Roebuck & Co.*, 713 F.2d 705, 713 (Fed.Cir.1983). "An exceptional case must be established by clear and convincing evidence." *Multi–Tech, Inc. v. Components, Inc.*, 708 F.Supp. 615, 620 (1989) (citing *Advance Transformer Co. v. Levinson*, 837 F.2d 1081, 1085 (Fed.Cir. 1988)); *Reactive Metals*, 769 F.2d at 1582.

After deciding a case is exceptional, the Court must consider additional factors in order to determine whether an award of attorney fees is appropriate. Some of those factors include the closeness of the case, tactics used by counsel, the conduct of the parties, and any other factor that may result in a fairer allocation of the burdens of the litigation between the parties. *J.P. Stevens*, 822 F.2d at 1051 (citations omitted). Only if the Court determines that it would be unjust not to award attorney fees should the prevailing party be granted them. *Rohm & Haas Co. v. Crystal Chemical Co.*, 736 F.2d 688, 692 (Fed.Cir.) *cert. denied*, 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984).

The Court is persuaded that this is an exceptional case. Hirsh and Smith systematically reviewed all of Molins' files relating to the prosecution of the System 24 invention. Hirsh selected out some records, and eventually destroyed the remainder. The files were destroyed after Molins began contemplating litigation. At a minimum, Hirsh's destruction of the files is evidence of "unfairness". The destruction precluded any potential Defendant from conducting full and fair discovery. When Hirsh's actions are considered in light of the other evidence of inequitable conduct on the part of Molins, the destruction of the files constitutes bad faith. It is this evidence of unfairness and bad faith on the part of Molins that convinces the Court that this is an exceptional case.

Nonetheless, the Court is unable to conclude on the present record that it would be unjust not to award attorneys fees. Additional briefing on the issue whether the Court should exercise its discretion and award attorneys fees to the Defendants would be helpful. Therefore, the Court will order a briefing schedule with regard to this issue.

## III. CONCLUSION

For the reasons discussed, the Court concludes that the '563 patent is unenforceable due to the inequitable conduct of Whitson, Smith and Hirsh in the prosecution of the subject patent. Further, the Court concludes that the '410 patent is unenforceable as it relies on the '563 patent.

Title 37 C.F.R. 1.56(d) provides:

> The claims in an application shall be rejected if upon examination pursuant to 35 U.S.C. § 131 and § 132, it is established by clear and convincing evidence (1) that any fraud was practiced or attempted on the Office in connection with the application, or in connection with any previous application upon which the application relies, or (2) that there was any violation of the duty of disclosure through bad faith or gross negligence in connection with the application, or in connection with any previous application upon which the application relies.

The Court concludes that the inequitable conduct present in the prosecution of the '563 patent extends to the '410 patent since the '410 patent relies on the '563 patent. The inequitable conduct present in an application relates to the entire patent right and cannot be excused by the filing of a divisional application. *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245–247, 54 S.Ct. 146, 147–148, 78 L.Ed. 293 (1933); *Driscoll v. Cebalo*, 731 F.2d 878, 884–885 (Fed.Cir.1984). Accordingly, the Court concludes that the inequitable conduct present in the prosecution of the '563 patent renders the '410 patent equally unenforceable. Defendants shall submit a Proposed Form of Final Judgment Order no later than January 17, 1993. Plaintiff shall have until January 24, 1993, in which to file any objections to the Proposed Order.

1582

## Chronology of Significant Events

| DATE | EVENT |
|---|---|
| 9/13/65 | U.K. Batch Process filed |
| 5/12/66 | U.K. System 24 filed |
| 9/66 | U.S. Batch Process filed (Case I) |
| 5/8/67 | U.S. System 24 filed (Case II) |
| 12/4/67 | U.S. Case III filed |
| 2/21/68 | Smith files additional claims 68–71 |
| 5/68 | Molins buys Lemelson '014 |
| 5/11/68 | Whitson abandons Austrian Batch Process because of Wagenseil |
| 10/21/68 | Whitson abandons the Russian Batch Process application because of Wagenseil |
| 11/8/68 | Whitson abandons the Japanese Batch Process application because of Wagenseil |
| 1/22/69 | Whitson's Austrian patent agent discloses Wagenseil as relevant prior art to the Austrian System 24 application |
| 1/29/69 | Whitson abandons Canadian Batch process application because of Wagenseil |
| 6/6/69 | U.S. PTO issues restriction requirement in Case III, forcing Molins to elect between four groups of claims |
| 6/10/69 | Whitson abandons U.K. Batch Process application |
| 7/3/69 | Whitson abandons the Czechoslovakian Batch Process application |
| 7/7/69 | Smith and Whitson respond to U.S. restriction requirement |
| 10/3/69 | U.S. PTO rejects all of Molins' claims in Case III |
| 10/9/69 | Whitson's German agent cites Wagenseil to the German PTO as relevant prior art to the German System 24 application |
| 3/10/70 | Whitson and Smith respond to October, 1969 rejection |
| 3/18/70 | Smith and Whitson change Case III application from a continuation to a continuation-in-part |
| 6/29/70 | U.S. PTO Notice of Allowance |
| 10/29/70 | Smith and Whitson file Case IV as a continuation of Case III |
| 10/13/71 | German Patent office rejects German System 24 claims |
| 12/29/71 | U.S. PTO rejects Batch Process claims |
| 2/17/72 | Whitson's German agent responds to German System 24 rejection |
| 2/72 | Molins send German PTO a list of all foreign art cited in counterpart System 24 applications |
| 4/27/72 | Smith and Whitson respond to U.S. PTO office action of 12/29/71, provoke the Williamson/Fair/Perry interference |
| 8/6/73 | Smith and Whitson file interference motions arguing priority based on the 1965 U.K. batch process application |
| 10/29/74 | Japanese patent office rejects the Japanese System 24 claims over a combination of Wagenseil and Lemelson patent 3,049,247 |
| 1/24/75 | German System 24 application is opposed |
| 5/9/75 | Whitson's German associate informs Whitson that the German System 24 application was opposed by 6 German companies |

| DATE | EVENT |
|------|-------|
| 6/12/75 | Whitson informs Smith that the German System 24 application was opposed |
| 2/20/75 | Dutch patent office requires Molins to file new System 24 claims and a new description beginning with disclosures known from Wagenseil |
| 4/8/76 | Benziger tells German associate to abandon German System 24 application |
| 4/15/76 | Benziger tells Japanese associate to abandon the Japanese System 24 application |
| 4/4/77 | U.S. PTO decides Williamson/Fair/Perry interference in favor of Molins |
| 6/27/78 | U.S. PTO rejects all of Molins' claims |
| 11/27/78 | Whitson and Smith respond to the June 27, 1978 rejection |
| 3/14/79 | U.S. PTO rejects Molins' claims based upon Lemelson '889 and Lemelson '247 |
| 8/15/79 | Whitson and Smith respond to March 14, 1979 rejection |
| 12/79 | Molins assigns Smith a one-half interest in U.S. System 24 application |
| 9/17/82 | Williamson signs a supplemental declaration for the System 24 application |
| 9/30/82 | Molins files a divisional application which includes batch process claims |
| 1/25/83 | U.S. System 24 application issues as '563 patent |